Danny Earl **HANKS**, Petitioner,

v.

Andrew **JACKSON**, Respondent.

No. CIV. A. 99–40497–FL.

United States District Court,
E.D. Michigan,
Southern Division.

Nov. 21, 2000.

Danny Hanks, Lapeer, MI, Pro se.

Janet Van Cleve, Michigan Department of Attorney General, Habeas Corpus Division, Lansing, MI, for Respondent.

## OPINION AND ORDER DENYING HABEAS CORPUS PETITION

GADOLA, District Judge.

### I. Introduction

Petitioner, Danny Earl Hanks ("Petitioner"), presently confined at the Huron Valley Men's Correctional Facility in Ypsilanti, Michigan, has filed this pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 alleging that he is confined in violation of his constitutional rights. In his application, petitioner challenges his convictions after a jury trial for armed robbery, M.C.L. § 750.529, unlawful driving away of a motor vehicle, M.C.L. § 750.413, and felony firearm, M.C.L. § 750.227b. Petitioner was sentenced to concurrent terms of twenty to fifty years imprisonment for armed robbery and three years and four months to five years imprisonment for unlawfully driving away a motor vehicle and a consecutive two year term for felony firearm. For the reasons set forth below, the Petition for Writ of Habeas Corpus shall be denied.

### II. Factual Background

Petitioner's convictions arise out of an armed home invasion of the Marcellus, Michigan, home of Mr. Terry Ferrell and his wife Mrs. Patty Ferrell. Also present during the home invasion were the three Ferrell children, Blake, Colleen, and Tara; a young man living with the Ferrells named Nakia Davis, and three visitors named Richard Pease, Robert Pease, and Richard Clark. On October 20, 1993, while those present at the Ferrell home were watching a World Series baseball game on television, two armed men forced their way inside. One of the intruders wore a ski mask. The other, subsequently identified as Petitioner, was not masked. Both intruders were armed with handguns.

The intruders struck several of the adult male victims on the head with their handguns while pointing their guns at all of the victims. The intruders forced Patty Ferrell and one of the Ferrell daughters to show them the whereabouts of money and valuables. The intruders found and stole cash, jewelry, hunting rifles and shotguns, and some marijuana. The unmasked intruder forced Patty Ferrell to show him around the house looking for valuables. Most of the victims were immobilized with duct tape by their assailants. The intruders drove off with Mr. Pease's car. The entire criminal episode lasted about thirty or forty minutes. No identifiable fingerprints were found on any of the duct tape used to bind the victims or any objects in the victims' home.

In January of 1994 Robert Pease saw a man in the Decoy Ducks Bar in nearby Lawton, Michigan, whom he recognized as the unmasked intruder. The intruder had pointed a gun at Pease's head and hog-tied him with duct tape. Pease sat with the man at the bar and drank a beer with him. The man related that he owned a gun and recently came to the area from Kentucky. Pease went to the police with this information. Pease described the assailant as unshaven and having a pockmarked face. The unmasked intruder was described by various witnesses as being about five feet nine or ten inches tall, weighing between one hundred and fifty to one hundred and eighty-five pounds. He was wearing a jacket which obscured his body build. Witnesses described the unmasked man as being in his thirties, having wet dark

brown or black hair and a mustache, and a pockmarked face.

On the basis of accounts of the home invasion and Robert Pease's subsequent viewing of the man suspected of being the unmasked intruder at the Decoy Ducks, the police constructed a photo array of six photos including one of Petitioner, which they showed to Patty Ferrell. Patty Ferrell identified the picture of Petitioner as being that of the unmasked perpetrator. Tr. Vol. II at 49–50.

Robert Pease identified Petitioner as the unmasked home invader at Petitioner's trial. Robert Pease saw the man's face at a close distance for about ten minutes during the home invasion and about ten minutes in the Decoy Ducks Bar. He described the unmasked intruder as having a pockmarked complexion. During the trial, Robert Pease was allowed to walk to the defense table and observe Petitioner from across the table, to approximate the distance from which he had seen him during the incident. Robert Pease was then asked if the marks he saw on Petitioner's face appeared to be pockmarks. He replied that they did. Tr. Vol. I at 142–43.

Terry Ferrell identified Petitioner at trial as the unmasked intruder. Terry Ferrell saw the unmasked intruder intermittently throughout home invasion as the intruder went about the house looking for valuables, demanding information from the victims about marijuana and other valuables, and tying the victims' hands and feet with duct tape.

Richard Clark was sitting in Robert Pease's car when the masked gunman told him to go into the house. Clark did so. Once inside, the unmasked gunman hit him on the head. Clark got a brief, close look at the unmasked gunman's face. Clark identified Petitioner at his trial as the unmasked gunman.

Colleen Ferrell was eight years old at the time of the crimes. Colleen Ferrell went upstairs with the unmasked intruder and showed him where some money, dope, and other items were. The lights were on. Colleen Ferrell identified Petitioner as the unmasked intruder.

Nakia Davis was a high school senior living with the Ferrells. The intruders ordered him to the ground during the home invasion. He got on the ground near some of the small children. He got a good look at the unmasked intruder. Nakia Davis looked up several time during the incident, despite being ordered not to do so. One of the intruders eventually kicked him in the ribs breaking one of them, because he kept looking up. Nakia Davis testified at Petitioner's trial that he was certain Petitioner was the unmasked intruder.

Tara Ferrell was eight years old at the time of the home invasion. She testified that she saw a man come in with a gun pointed at Robert Pease's head and that the gunman ordered them to get on the ground and not look or he would shoot them. At first she looked at the man anyway. Then she sat down on the floor and closed her eyes. Tara Ferrell identified Petitioner as the unmasked intruder.

Patricia Ferrell testified that she was in the shower when the home intrusion began. She heard her husband's voice and noticed a tone of distress in his voice, but continued showering anyway. Soon afterwards, she heard her husband's distressed voice again. She turned off the shower. Moments later the bathroom door opened and a someone flung open the shower curtain. She was face to face with an armed man who pointed a gun at her and repeatedly demanded to know where the money, guns, and dope were. Patricia Ferrell described the unmasked man as not tall, of a slight to medium build, white with a rough complexion, dark wet hair, and a rough, scruffy looking mustache. Tr. Vol. II at 21–22. He spoke decisively with a distinctive Southern accent. The man continued to demand money, guns, and dope, so she walked to her bedroom and gave the man about six hundred dollars which her husband had in his dresser

drawer. After she gave him the money, they walked downstairs together.

Patricia Ferrell viewed two photo displays as part of the police investigation of the incident. She did not identify anyone at the first photo display. She identified Petitioner at the second photo display. At trial, Patricia Ferrell identified Petitioner as the unmasked gunman whom she had seen face-to-face for a considerable time while she was standing in the bathtub and he was standing just outside of it. When asked if she was certain if Petitioner was the unmasked robber, she replied: "There's no doubt in my mind whatsoever. I mean, when a man stands face to face with you and holds a gun in your face you don't forget what he looks like." Tr. Vol. II at 39.

Petitioner presented several witnesses.

Walter Gersitz testified that he was an acquaintance of Nakia Davis and that he picked him up at the hospital after the home invasion. Upon hearing of the incident from Davis, Gersitz suspected that a man named Tim Holden had actually been the unmasked intruder. Gersitz described Tim Holden as being of uncertain height, "about one hundred and eighty pounds, pitted face, dirty, southern accent." Tr. Vol. II at 77. According to Gersitz, Holden drove a van similar to one seen outside the Ferrells' home the night of the robbery. Gersitz also testified that Nakia Davis became very upset when he saw the van parked near the home of an associate of Tim Holden later that night. On cross-examination, Gersitz admitted that Davis was generally agitated the entire time after leaving the hospital, and seemed emotionally excited, stressed, and terrified by the events which had taken place and became more excited when he recounted them.

Brenda Mitchell testified that she had known Petitioner for all of her life. Petitioner was living downstairs from her at the time of the incident. Brenda Mitchell testified that, on Wednesday, October 20, 1993, the night of the criminal episode,

Petitioner was playing cards at her house with her and her friends and relatives at a regular Wednesday night card game. She remembered this particular game because October 20th was the birthday of her father, Ollice Teague. Her father had passed away in May of 1993 and this was the first anniversary of his birth after his passing. Petitioner was at her home the entire evening playing cards and drinking. He passed out on the couch at about 12:30 a.m. He got up and went to his apartment at about 4:30 a.m. Brenda Mitchell testified that, to her knowledge, Petitioner weighed about one hundred and twenty-five or thirty pounds at the time of the incident, substantially less than the victims' estimate of the unmasked robber's weight.

Sherman Clouse testified that he lived with Brenda Mitchell. He testified that Wednesday nights were a regular card playing night at Brenda's house. He remembered seeing Petitioner playing cards, drinking, and passing out there on many occasions, including Wednesday night card games. However, he could not recall for certain whether he (Clouse) had been there or had seen Petitioner there on October 20, 1993. Sherman Clouse thought that Petitioner was skinny and weighed no more than one hundred and fifty pounds and did not have a particularly bad complexion. He thought Petitioner's most distinguishing features were his big ears and red nose. None of the victim witnesses had mentioned the unmasked robber's ears or nose.

James Christopher Teague testified that Brenda Mitchell was his aunt. He attended poker parties at Brenda Mitchell's on Wednesday nights in 1993, including October of 1993. Petitioner sometimes was there. James Christopher Teague said Petitioner drank at these parties sometimes, but he did not recall seeing Petitioner become intoxicated there. He was not asked whether he recalled being there on October 20, 1993. He attended his grand-

father Ollice Teague's funeral. He thought he had died in October of 1993, or sometime near then, but was not certain of the date. He could not recall his grandfather's birthday, but thought October 27, 1930, sounded about right.

James O. Teague was Brenda Mitchell's brother and Ollice Teague's son. He went to Brenda Mitchell's house three Wednesdays a month for card parties.[1] Petitioner was usually there. James O. Teague testified that Ollice Teague's birthday was October 27, 1930. He further testified that, if Brenda Mitchell testified that Ollice Teague's birthday was October 20, 1930, she was mistaken. He knew because he carried his father's driver's license as a memento and also kept all of his family members' birth dates written down in his wallet. Tr. Vol. II at 123. James O. Teague further testified that there had been talk during the evening of October 20, 1993, about the proximity of the birthdays of his father (Ollice Teague, October 27th) and his grandfather (Ollice Teague's father, October 20th). When asked if Petitioner was there that night, he replied, "Best I recollect, yes." Tr. Vol. II at 124. When asked if it was possible that Petitioner was not there, he replied, "No. He was usually there. Like I say, he lived downstairs." *Id.*

Petitioner was convicted of armed robbery, unlawful driving away a motor vehicle, and felony firearm. Petitioner was sentenced to concurrent terms of twenty to fifty years imprisonment for armed robbery and three years and four months to five years imprisonment for unlawfully driving away a motor vehicle and a consecutive two year term for felony firearm.

### III. Procedural History

Petitioner appealed his conviction as of right in the Michigan Court of Appeals raising the following claims:

I. The trial court deprived him of a fair trial by refusing to give his requested instruction regarding his defense of alibi.

II. The in-court identifications of defendant were tainted because a pre-arrest photographic lineup was held without the presence of counsel.

III. Defendant was sentenced improperly under the Michigan Sentencing Guidelines.

IV. Defendant's sentence is disproportionate to his crime and prior record.

The Michigan Court of Appeals affirmed Petitioner's convictions and sentences in an unpublished opinion. *People v. Hanks,* Michigan Court of Appeals Docket No. 187015 (June 20, 1997). Petitioner presented his jury instruction and uncounseled photographic identification claims to the Michigan Supreme Court, which denied his application for leave to appeal because it was "not persuaded that he questions presented should be reviewed by this Court." *People v. Hanks,* Michigan Supreme Court 457 Mich. 879, 586 N.W.2d 922 (1998). Petitioner stated that he waived his sentencing issues in his delayed pro per application for leave to appeal in his direct appeal.

Petitioner returned to the trial court and filed a motion for relief from judgment raising a claim that his sentence was imposed on the basis of mistaken information. The trial court denied the motion. *People v. Hanks,* Circuit Court for the County of Cass Docket No. 95–8340 (December 22, 1998). The Michigan Court of Appeals denied relief on this sentencing claim, stating that Petitioner failed to meet the burden for establishing entitlement to relief under M.C.R. 6.508. *People v. Hanks,* Michigan Court of Appeals Docket No. 218033 (November 12, 1999). The Michigan Supreme Court denied relief, stating that Petitioner failed to establish entitlement to relief under M.C.R.

---

1. James O. Teague was not asked which three Wednesdays a month he attended the card parties. He also was not asked if the parties were held only three Wednesdays a month, or if attending three Wednesdays a month was only his practice.

6.508(D). *People v. Hanks*, Michigan Supreme Court 462 Mich. 869, 616 N.W.2d 688 (2000).

Thereafter, on May 25, 1999, Petitioner filed the present petition for a writ of habeas corpus presenting the following issue:

I. Where a photographic showup was held without presence of counsel, resulting in Petitioner's later arrest for the instant crime, was the identification process contaminated so as to deny defendant due process and create a high likelihood of misidentification?

On June 12, 2000, Petitioner filed an Amended Writ of Habeas Corpus raising the following additional claims:

I. Petitioner was denied due process and a fair trial when the trial court denied his request for a jury instruction on alibi as a "perfect defense."

II. Petitioner's sentence is invalid and he is entitled to resentencing where he was denied his guaranteed right to due process when the trial court based its decision on inaccurate information in the PSI report that was prejudicial to Petitioner and Petitioner could not challenge this error at sentencing.

Respondent has answered the petition and contends that Petitioner's challenge to his photo display identification is procedurally defaulted and lacks merit. Respondent has not addressed Petitioner's challenge to his jury instructions and his sentencing claim.

## IV. Standard of Review

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, 110 Stat. 1214 (April 24, 1996)("AEDPA" or "the Act"), govern this case because Petitioner filed his habeas corpus petition after the effective date of the Act. *Lindh v. Murphy*, 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997).

The AEDPA altered the standard of review that a federal court must use when reviewing applications for writs of habeas corpus.

As amended, 28 U.S.C. § 2254(d) provides that:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

The United States Supreme Court has recently addressed the question of the proper interpretation of the amendments to the habeas corpus statute concerning entitlement to relief. The Supreme Court has stated that "[i]n sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court." *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000). The Supreme Court summarized the standard of review as follows:

Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state-court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite that reached by this Court on a question of

law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.,* 120 S.Ct. at 1523.

■ "[A] federal habeas making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 1521. The reviewing court should not inquire whether all reasonable jurists would agree that the state court's decision was reasonable or unreasonable. The reviewing court must be aware that "an unreasonable application of federal law is different from an incorrect application of federal law." *Id.* at 1522. However, a postulated complete unanimity of the entire federal judiciary that a state court decision is unreasonable is not required before the reviewing court may conclude that the decision in question includes at least one dispositive unreasonable application of clearly established federal law.

■ Where constitutional trial error has been shown and the reviewing court concludes that the error had a substantial and injurious effect or influence in determining the jury's verdict, a state court ruling finding such error harmless beyond a reasonable doubt is outside the realm of plausible, credible outcomes and the petitioner is entitled to habeas relief. *Barker v. Yukins,* 199 F.3d 867 (6th Cir.1999), *cert. denied,* — U.S. ——, 120 S.Ct. 2658, 147 L.Ed.2d 273 (2000). "[A] state court's application of federal law is unreasonable and a writ may issue only if reasonable jurists would find it so arbitrary, unsupported or offensive to existing precedent as to fall outside the realm of plausible, credible outcomes." *Barker,* 199 F.3d at 871. "When a habeas court is in grave doubt as

to the harmlessness of an error that affects substantial rights, it should grant relief." *O'Neal v. McAninch,* 513 U.S. 432, 445, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995).

■ The federal court reviewing a habeas petition must apply the presumption of correctness to evidence-supported factual determinations made by a state court. *West v. Seabold,* 73 F.3d 81, 83 (6th Cir. 1996); *Lundy v. Campbell,* 888 F.2d 467, 469 (6th Cir.1989). This presumption may only be overcome by the presentation of clear and convincing evidence by the petitioner. 28 U.S.C. § 2254(e)(1).

## V. Analysis

### A. Photographic Display Claim

Petitioner contends that his in-court identifications are tainted because he was not represented by counsel at the photo displays conducted by the police before his arrest. The Michigan Court of Appeals noted that Petitioner admitted that this claim was not preserved. The Michigan Court of Appeals then addressed the merits of Petitioner's claim, finding that he "did not have a right to counsel at a precustodial, investigatory photographic lineup," and that in any case, the other identification evidence of Petitioner's guilt was "so overwhelming that any error would not have been decisive of the outcome." *People v. Hanks,* Michigan Court of Appeals Docket No. 187015 at 1–2.

■ Review of a habeas petitioner's constitutional claims may be barred if the denial of those claims by the state court is supported by an adequate and independent state ground. *See Wainwright v. Sykes,* 433 U.S. 72, 86–87, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). A procedural default will bar federal habeas relief when the last state court rendering its decision in the case clearly and expressly states that its decision rests on a state procedural bar. *Harris v. Reed,* 489 U.S. 255, 262–63, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989). If the

last state court judgment is clearly premised on a question of state procedural law that is independent of the merits of the federal claim, then habeas relief is not available. *Id.* at 264, 109 S.Ct. 1038. State procedural issues will be considered an independent and adequate basis for a state court judgment even if they are given as alternative grounds for the decision by the state court. *Id.* at n. 10. For purposes of habeas review, the last state court judgment is the last explained state court judgment. *Ylst v. Nunnemaker,* 501 U.S. 797, 803, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991).

 If a habeas petitioner is barred from presenting one or more of his claims to the state courts because of a procedural default, he has waived those claims for purposes of federal habeas corpus review unless he can show cause for the procedural default and actual prejudice resulting from the alleged constitutional error. To establish cause a petitioner must present a substantial reason to excuse his procedural default. This generally requires the petitioner to "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). Ineffective assistance of counsel is cause for a procedural default. In a case where the prosecutor committed blatant and prejudicial misconduct, the Sixth Circuit has found that "failure to object comprised ineffective assistance of counsel provid[ing] that required 'cause.'" *Washington v. Hofbauer,* 228 F.3d 689, 2000 WL 1475785 at * 13. However, the failure to object is not prejudicial if there was no substantial, prejudicial error to which to object. To establish prejudice the petitioner must "prove that he was actually prejudiced by the claimed constitutional error." *Rust v. Zent,* 17 F.3d 155, 161 (6th Cir.1994)(citing *United States v. Frady,* 456 U.S. 152, 170, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982)).

 Petitioner procedurally defaulted on his claim that his in-court identifications were tainted by an uncounseled out of court photo display by failing to contemporaneously object at trial. *People v. Van Dorsten,* 441 Mich. 540, 544–45, 494 N.W.2d 737 (1993); *People v. Kelly,* 423 Mich. 261, 378 N.W.2d 365 (1985). Petitioner has not attempted to show cause for this procedural default. Therefore, he has waived this claim for purposes of habeas review.

Further, even if Petitioner could show cause for his procedural default, Petitioner's claim that his uncounseled identification by Patricia Ferrell in an investigatory photo display held before his arrest and before the initiation of criminal charges against him would not entitle him to habeas relief for several reasons.

In *Kirby v. Illinois,* 406 U.S. 682, 689, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972), the Supreme Court ruled that the right to counsel set forth in *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) and *Gilbert v. California,* 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967) only applies to in-person identifications conducted "at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." This is the case because the initiation of such proceedings "marks the commencement of the 'criminal prosecution' to which alone the explicit guarantees of the Sixth Amendment are applicable." *Id.* at 690, 92 S.Ct. 1877. Therefore, in *Kirby,* the Supreme Court held that the evidence of a robbery victim's one-on-one police station identification of an uncounseled suspect was constitutionally permitted, because adversary judicial criminal proceedings had not yet begun. Thus, Petitioner did not have a federal constitutional right to counsel at the photo display because adversary criminal proceedings against him had not yet begun at the time of the photo display.

█ Furthermore, although the Sixth Amendment gives a criminal defendant the right to have counsel present at an in-person lineup after the initiation of criminal proceedings against him, there is no corresponding Sixth Amendment right to counsel during a photographic display. *United States v. Ash,* 413 U.S. 300, 321, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973); *Mikel v. Thieret,* 887 F.2d 733, 737 (7th Cir.1989). Thus, Petitioner had no federal constitutional right to counsel at the photo display because it was a photo display, not an in-person lineup.

This does not mean that Petitioner was without any constitutional protections during the photographic display. Petitioner did not have the right to counsel at the display. "In such cases, however, due process protects the accused against the introduction of evidence of, or tainted by, unreliable pretrial identifications obtained through unnecessarily suggestive procedures." *Moore v. Illinois,* 434 U.S. 220, 227, 98 S.Ct. 458, 54 L.Ed.2d 424 (1977). However, Petitioner has not alleged and cannot show that the photographic display was unnecessarily suggestive.

█ Petitioner has submitted a photocopy of the photographic display as his Exhibit B. The display consists of six photos, five of which are visible in the photocopy submitted as Exhibit B.[2] The photos are arranged in two rows of three photos. All six photos are the same size. Petitioner was identified at trial as being pictured in the middle position of the lower row. All of the photos are "mug shots," that is, police photos in which the words "Sheriff's Department" are visible at the bottom of most of the photos and a height scale is visible in the background. Therefore, the photo of Petitioner was not unnecessarily suggestive by being the only, or one of the only, police photos used. All of the subjects are white men appearing to be of roughly the same age. The height scale indicates that the subjects ranged from five feet eight inches to six feet six inches tall. However, at least two of the other subjects are five feet eight or nine inches tall, Petitioner's approximate height. All of the subjects appear to have mustaches. At least two of the other subjects appear to have somewhat long and rather slender faces with long noses as does Petitioner.

█ Great discrepancies between the size and/or visual appearance of the suspect and all of the other subjects in an identification array may be unnecessarily and impermissibly suggestive. However, minor discrepancies between the suspect and other subjects do not render an identification procedure unconstitutional. Furthermore, it is not necessary for all of the subjects in an identification procedure to be of very similar size or appearance. *Foster v. California,* 394 U.S. 440, 441, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969); *United States v. DeBose,* 433 F.2d 916, 917 (6th Cir.1970).

This Court concludes after examination of the photocopy of the photo display used to identify Petitioner as a suspect that the photo display itself was not unnecessarily suggestive and therefore did not taint Petitioner's in-court identifications.

Further, testimony at trial by Patricia Ferrell and Detective David Gizzi established that when Gizzi showed Patricia Ferrell the photo display, he simply told her to look at the photo display and tell him if she saw the individual she observed during the criminal episode. Tr. Vol. II at 38–39; 50. Before viewing the photo display at which she identified Petitioner, Patricia Ferrell had been shown a different photo display at which she did not identify anyone. Tr. Vol. II at 38. This evidence indicates that the photo display was not conducted in a suggestive manner. That

---

**2.** It is the photo in the far left position of the lower row in which the face and upper body of the subject is "blacked-out" by poor copy quality. The words "Sheriff's Department Cass County Michigan" are visible, however, indicating that this photo, like the others is a police mug shot.

is, Patricia Ferrell was not improperly steered or prompted to identify Petitioner from among the individuals pictured in the display.

This Court concludes that the photo display itself used to identify Petitioner as a suspect in the home invasion was not unnecessarily suggestive and the manner in which it was conducted also was not unnecessarily suggestive. Therefore, his in-court identifications were not tainted by this out of court identification. *United States v. Ash*, 413 U.S. at 320, 93 S.Ct. 2568; *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *Neil v. Biggers*, 409 U.S. 188, 198, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

Petitioner had no federal constitutional right to counsel at the investigatory photographic display identification procedure at which he was identified because (1) adversary criminal proceedings against him had not yet begun at the time of the photo display and (2) there is no Sixth Amendment right to counsel during a photographic display. The photographic display itself and the manner in which it was conducted were not unnecessarily suggestive. Consequently, Petitioner's constitutional rights were not violated by his identification at this photographic display and his subsequent in-court identification. Therefore, it was not attorney error to fail to object to his identification on this basis. Accordingly, Petitioner can not show cause for his state procedural default on this issue and also can not show prejudice from the alleged constitutional error. The Michigan Court of Appeals' decision finding that Petitioner's pre-trial and trial identifications were constitutional was both reasonable and correct. Therefore, Petitioner's claim that his uncounseled photographic identification violated his constitutional rights and tainted his in-court identification is denied.

## B. Jury Instruction Claim

Petitioner contends that his jury instructions failed to properly instruct regarding his alibi defense. The Michigan Court of Appeals found that the trial court's jury instruction to the jury regarding Petitioner's alibi defense fairly presented the issue to the jury and sufficiently protected his rights.

Petitioner requested and the trial court denied an instruction in which the jury would be informed that an alibi was a "perfect defense." "That is, if the jury finds that defendant was not present at the scene of the crime at the time that it occurred, then that is a perfect defense and they must return a verdict of not guilty." Tr. Vol. II at 133. The trial court declined to give this instruction and instead gave a newer instruction known as Lack of Presence (Alibi), CJI2d 7.4. That instruction reads as follows:

(1) You have heard evidence that the defendant could not have committed the alleged crime because [he/she] was somewhere else when the crime was committed.

(2) The prosecutor must prove beyond a reasonable doubt that the defendant was actually there when the alleged crime was committed. The defendant does not have to prove that [he/she] was somewhere else.

(3) If after carefully considering all the evidence, you have a reasonable doubt about whether the defendant was actually present when the alleged crime was committed, you must find [him/her] not guilty.

Michigan CJI2d 7.4 Lack of Presence (Alibi).

The trial judge gave this lack of presence instruction in its entirety. Tr. Vol. III at 18. The trial judge also stated in summarizing Petitioner's theory of the case that "[t]he defendant contends that he is innocent and not guilty of the charges made against him in this case because he was not present at the commission of these crimes and that his lack of presence constitutes an absolute defense." *Id.* at 20.

■■■■■ To warrant habeas relief, jury instructions must not only have been erroneous, but also, taken as a whole, so infirm that they rendered the entire trial fundamentally unfair. *Estelle v. McGuire*, 502 U.S. 62, 72, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991); *Henderson v. Kibbe*, 431 U.S. 145, 154, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977). If an instruction is ambiguous and not necessarily erroneous, it violates the Constitution only if there is a reasonable likelihood that the jury has applied the instruction improperly. *Estelle*, 502 U.S. at 72, 73 n. 4, 112 S.Ct. 475. The Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt. See *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). The Supreme Court has explained, however, that "the Constitution does not require that any particular form of words be used in advising a jury of the government's burden of proof." *Victor v. Nebraska*, 511 U.S. 1, 5, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994). In *Victor*, the Court rejected a challenge to an instruction that a reasonable doubt is not a mere possible doubt.

In *Binder v. Stegall*, 198 F.3d 177 (6th Cir.1999), the Sixth Circuit noted that "[t]here are no magic words that must be included or omitted [in a reasonable doubt jury instruction]." Trial courts have broad discretion in wording jury instructions. *United States v. Schlei*, 122 F.3d 944, 969 (11th Cir.1997). The failure to give a particularly worded jury instruction does not require reversal in the absence of prejudice, that is, a conviction should not be reversed on the basis of instructional error alone, unless the jury charge improperly guided the jury in such a substantial was as to violate due process. *Schlei*, 122 F.3d at 969.

■■■■ The lack of presence jury instruction given by the trial court properly informed the jury that it could convict only if the prosecutor proved beyond a reason-able doubt that Petitioner was actually present when the home invasion took place. The lack of presence jury instruction informed the jury that the burden of proof was on the prosecution and that, if after considering all of the evidence, it had a reasonable doubt whether Petitioner was actually present when the charged crimes were committed, it must find him not guilty. Finally, the judge informed that jury that Petitioner's theory of the case was that he had not been present when the crimes had been committed and that he had been mistakenly identified.[3] The judge told the jury that lack of presence at the commission of these crimes was an "absolute defense." Tr. Vol. III at 20. These instructions were adequate to guide the jury in its consideration of Petitioner's defense that he had been elsewhere playing cards when the home invasion to place at the Ferrells' residence. There is no reasonable likelihood that the jury applied this instruction improperly. It is clear that the jury convicted Petitioner because they rejected his alibi defense, not because of the jury instructions given by the trial court. The Michigan Court of Appeals ruling that the complained-of instruction was not improper was a reasonable application of applicable federal constitutional law. Consequently, Petitioner's jury instruction challenge is denied.

## C. Sentencing claim

Petitioner contends that his sentence was imposed on the basis of materially mistaken information. Petitioner asserts that his pre-sentence report ("PSI") incorrectly stated that he had one prior felony, when actually he had six prior misdemeanors, but no prior felonies. The Michigan courts found that Petitioner was not entitled to relief on this claim because it was either previously decided against Petitioner in his appeal of right or could have been raised in his appeal of right, but was not. M.C.R. 6.508(D).[4] In his appeal of right

---

**3.** Identification instructions were also given. Tr. Vol. III at 18–19. CJI2d 7.8.

**4.** M.C.R. 6.508(D)(2) states that the court may not grant relief if the motion alleges grounds

Petitioner challenged whether his offense variable score had been properly calculated and whether his sentence was proportionate to his prior record. The Michigan Court of Appeals denied relief on both of those claims in his appeal of right, finding that any mistakes in calculating Petitioner's offense variable score were harmless because they did not affect his offense severity level and that his sentence was within the guidelines and presumptively proportionate under Michigan law. *People v. Hanks*, Michigan Court of Appeals Docket No. 187015 at 2.

This Court need not determine whether Petitioner has procedurally defaulted on this claim. For purposes of this opinion, this Court shall assume that Petitioner has exhausted this issue and that it is not procedurally defaulted.

 In order to prevail on a claim that the trial court relied on materially inaccurate information at sentencing, a habeas petitioner must show that the sentencing court actually relied on this information and that it was materially false. *Townsend v. Burke*, 334 U.S. 736, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948); *Collins v. Buchkoe*, 493 F.2d 343, 345–46 (6th Cir. 1974); *Welch v. Burke*, 49 F.Supp.2d 992, 1007 (E.D.Mich.1999). Review of the sentencing transcript shows that defense counsel informed the sentencing judge that "[t]his is [Petitioner's] first serious felony event." Sentence Tr. at 12. There is no indication in the sentencing transcript that the prosecutor claimed otherwise. Nearly all of the sentencing transcript is devoted to a discussion of the nature of the crimes committed, whether the children were properly considered victims of the armed robbery, and the proper offense variable score for the crimes. Consequently, this Court concludes that Petitioner has not established that any information relied upon by the sentencing judge concerning his prior convictions was materially mistaken.

Moreover, in imposing sentence, the judge did not say anything about Petitioner's prior criminal record, or lack thereof. First, the judge summarized the violent, protracted, and frightening nature of the crimes, and noted that there were many victims, including three children. Then the judge stated that: "While the Court will sentence you within the guideline range, and I see no reason to deviate from it, these aggravated circumstances surrounding this crime warrant in the Court's opinion the maximum penalty permitted under the guidelines." *Id.* at 13. The judge then sentenced Petitioner to twenty to fifty years for armed robbery, a shorter concurrent sentence for unlawfully driving away an automobile, and a mandatory two year consecutive sentence for felony firearm.

There were six adult victims and three child victims in the present armed robbery. The robbery lasted for about thirty or forty minutes. Several of the victims were bludgeoned with handguns or kicked causing serious injuries. All were bound and all were threatened with being shot. Most were hog-tied with duct tape. Thus, the criminal episode was substantially more protracted and violent and involved many more victims than many armed robberies. Review of the record shows that the sentencing judge imposed the sentence which he did because of the particularly protracted and violent nature of the armed

for relief which were decided against the defendant in a prior appeal or prior motion for relief from judgment. M.C.R 6.508(D)(3) states that the court may not grant relief (absent a showing of cause and prejudice) if the motion alleges grounds for relief which could have been presented in the defendant's appeal of right, but were not. Since neither the Michigan Court of Appeals' order or the Michigan Supreme Court's order affirming denial of Petitioner's motion for relief from judgment state which provision upon which they rely, it is unclear whether Petitioner's motion for relief from judgment was denied as presenting a claim which had been previously been decided against him, M.C.R. 6.508(D)(2), or as presenting a claim which he failed to present in his appeal of right. M.C.R. 6.508(D)(3).

robbery of which Petitioner was convicted, not because of Petitioner's prior criminal history. Consequently, this Court concludes that Petitioner has not shown that the sentencing judge actually relied on any allegedly mistaken information about Petitioner's prior criminal history when deciding what sentence to impose.

Because Petitioner has failed to demonstrate in his petition that the sentencing court relied upon materially false information in imposing sentence, this claim is without merit. *Thomas v. Foltz,* 654 F.Supp. 105, 108 (E.D.Mich.1987).

■■■■ The maximum sentence for armed robbery in Michigan is life imprisonment or any term of years. M.C.L. § 750.529. A sentence imposed with the statutory limits is generally not subject to habeas review. *Townsend v. Burke,* 334 U.S. at 741, 68 S.Ct. 1252; *Rummel v. Estelle,* 445 U.S. 263, 272, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980); *Harmelin v. Michigan,* 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991); *United States v. Thomas,* 49 F.3d 253, 260–61 (6th Cir. 1995). A claim that a sentence is imposed in violation of Michigan's sentencing law does not state a claim for relief in a habeas proceeding where there is no claim that the sentence violates that cruel and unusual punishment clause of the Eighth Amendment. *Atkins v. Overton,* 843 F.Supp. 258, 260 (E.D.Mich.1994). Because Petitioner does not claim that his sentence violates the Eighth Amendment, he has failed to state a claim upon which habeas relief can be granted concerning his sentence's length as such. In any event, even if Petitioner did allege that his sentence was cruel and unusual punishment, United States Supreme Court precedent shows that such a claim would be without merit. See, e.g., *Hutto v. Davis,* 454 U.S. 370, 102 S.Ct. 703, 70 L.Ed.2d 556 (1982)(per curiam)(forty year sentence for first felony offender convicted of possessing with intent to deliver nine ounces of marijuana did not violate the Eighth Amendment).

Because Petitioner's twenty to fifty year sentence for armed robbery was imposed on the basis of the nature and extent of his crimes and was not imposed on the basis of materially mistaken information, and because claimed violations of state sentencing law are not a basis for federal habeas relief and Petitioner's sentence is not cruel and unusual punishment, Petitioner's challenge to his sentence does not entitle him to habeas relief. Furthermore, to the extent that they involve application of federal sentencing law, the Michigan courts' decisions denying Petitioner's sentencing claims are reasonable applications of controlling federal law. Therefore, Petitioner's challenge to his sentences is denied.

## VI. Conclusion

Based on the foregoing, the Court concludes that none of Petitioner's claims merit habeas relief. Petitioner's convictions and sentences are not based on an adjudication that resulted in a decision that was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States. Nor are his convictions and sentences based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

Accordingly, the petition for a writ of habeas corpus is **DENIED**.

**SO ORDERED.**